Filed 5/27/15  P. v. Perez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JORDAN MICHAEL PEREZ et al.,<br><br>    Defendants and Appellants. | B254671<br><br>(Los Angeles County<br>Super. Ct. No. BA414240) |

APPEALS from judgments of the Superior Court of Los Angeles County.  Gail Ruderman Feuer, Judge.  Affirmed as to Montecino; affirmed as modified as to Perez.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant Jordan Michael Perez.

Michele A. Douglass, under appointment by the Court of Appeal, for Defendant and Appellant Jess Montecino.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, and Chung Mar and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Jordan Michael Perez (Perez) and Jess Montecino (Montecino) (collectively defendants), appeal from their second degree robbery convictions. Montecino contends that trial counsel provided ineffective assistance by failing to move for a separate trial of the two counts charged against him.[1] Perez contends that the trial court erred in failing to instruct the jury to view with caution his out-of-court oral statements, and in staying, rather than striking, the gang enhancement of Penal Code section 186.22, subdivision (b)(1)(C).[2] Respondent agrees with the claim of sentencing error, and as we conclude the trial court intended not to impose the punishment under the gang enhancement, we modify Perez's judgment accordingly. Finding no merit to defendants' remaining contentions, we otherwise affirm the judgments.

## BACKGROUND

Perez and Montecino were both charged in count 1 with the second degree robbery of Victor Medina (Medina), in violation of section 211. It was also alleged, pursuant to section 186.22, subdivision (b)(1)(C), that the crime was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist criminal conduct by gang members. In count 2 Montecino was charged with the second degree robbery of Felipe Calderon (Calderon), while personally using a firearm in the commission of the crime within the meaning of section 12022.53, subdivision (b). As to both counts it was alleged that Montecino was out of custody on bail when he committed the crimes, within the meaning of section 12022.1, and that he suffered a prior conviction for which he served a prior prison term as described in section 667.5.

Defendants were jointly tried. In court 1 the jury found Perez guilty as charged, and found true the gang allegation, but found Montecino not guilty.

---

[1] Montecino also filed a petition for writ of habeas corpus on the same ground, in case No. B258597. We have denied the petition in a separate order.

[2] All further statutory references are to the Penal Code, unless otherwise indicated.

The jury found Montecino guilty of count 2 as charged and found true the firearm allegation. Montecino admitted he was out of custody on bail when the crime was committed and that he had served the prior prison term.

The trial court sentenced Perez to the high term of five years in prison and imposed but stayed the 10-year gang enhancement. The court imposed mandatory fines and fees and calculated his custody credit of 227 days.

On March 25, 2014, Montecino entered a no contest plea to a violation of section 29800, subdivision (a)(1), felon in possession of a firearm, in Los Angeles Superior Court case No. BA410318. The trial court sentenced him in both cases. In case No. BA414240, the court imposed a total term of 16 years 8 months in prison, comprised of the middle term of three years as to count two, plus a 10-year firearm enhancement, one year due to the prior prison term, and two years for the out-on-bail enhancement. As to case No. BA410318, the trial court imposed a consecutive term of eight months in prison, which was one-third of the middle term of two years. The court imposed mandatory fines and fees, and awarded 280 days of custody credit. Montecino stipulated to direct victim restitution in the sum of $500.

Defendants filed timely notices of appeal.

**Prosecution Evidence**

### *The first robbery, count 1*

Medina testified that just before 5:00 p.m. on Sunday, July 28, 2013, he was walking home from the Superior Market carrying a bag of groceries when two men approached him. Medina thought he recognized the older-looking one of the men as a member of the local 213 gang, which frightened him. Medina tried to continue walking but the men stepped in front of him and the older one said he was going to search Medina's pockets. The younger-looking man said "213" and then felt inside Medina's pockets with his hands, removing change and the grocery store receipt. He also took Medina's grocery bag. The men then told Medina to walk with them; they crossed Montebello Boulevard and continued east on Los Angeles Street. A police car arrived

3

and the two men immediately dropped the bag and took off running east on Los Angeles Street.

Medina identified Perez in court as the man who said "213" and went through his pockets. Hearing Perez say "213" made Medina fear that he would be attacked, so he did not resist. He explained that he had seen a great deal of the gang's graffiti around and that he thought the 213 gang controlled the neighborhood. Medina denied that Montecino was the other robber. Medina alternatively claimed that he did not look at the robbers' eyes to avoid being hit, and that he saw the second man's face well enough to see that he did not have Montecino's distinctive "lazy eye."

Bathsheba Barajas (Barajas) testified that she observed the robbery from her front porch, and called 911 because the victim looked frightened. A recording of her 911 call was played for the jury. She told the operator that two men demanded money from a third, took his grocery bag, and then walked with him on Los Angeles Street. Barajas described the route the three men were walking until the police arrived. She also described their clothing: one robber wore a black shirt; the victim wore a gray shirt; and the second robber wore a white T-shirt. Barajas refused to give her name and number to the 911 operator.

Montebello Police Officer Taylor Marquez was the first to arrive in response to the 911 call. When he saw three men crossing Montebello Boulevard, matching the descriptions given by dispatch, he chirped his siren and turned on his overhead lights. With the three men looking in his direction, Officer Marquez got out of his patrol car and said, "Stop, police." Two of the men looked startled and then ran. The third man stopped and put up his hands. Officer Marquez was able to observe the two suspects for five full seconds before they ran. He radioed a description that one suspect was wearing a white shirt, black hat, and blue jeans shorts, while the other wore a black shirt and blue jeans shorts.

The two suspects initially ran together and then separated. Officer Marquez followed the suspect wearing the white shirt and black hat as other officers arrived to form a containment. Officer Marquez lost sight of the suspect after he jumped a fence

4

into the backyard of a residence. Another officer, Corporal Yap, spotted the suspect wearing the black shirt, later identified as Perez, who was subdued after he disobeyed commands to stop. Corporal Yap detained Perez, searched him and found a Superior Market receipt and 11 cents on him. The other suspect was not found that day. Two days later Officer Marquez happened to see Montecino in a glass cell of the Montebello jail and immediately recognized him as the suspect who had gotten away on July 28.

### *Other witnesses' failure to identify Montecino*

Both Medina and Barajas were reluctant witnesses. At the time he gave testimony Medina was in custody because he had failed to appear for a prior court hearing after having been served with a subpoena, and when a detective served him with a trial subpoena, Medina said he did not intend to appear. After officers detained Perez they asked Medina to participate in a field identification. Medina refused because he lived nearby and said that members of the 213 gang were always passing his home and he was afraid of what might happen. Two days after the robbery Detective Sergio Andrade showed Medina two six-pack photographic lineups, and although he recognized Perez's photograph in the first one, Medina did not tell the Detective, explaining that he did not want to identify anyone and that the suspects knew where he lived. Medina handed back the second six-pack of photographs without saying anything. At trial, Medina testified that he recognized one of the robbers in the second photographic lineup, but thought he was confusing the two men, so he did not make any selection.

Detective Paul Antista testified that after some investigation he identified Barajas as the 911 caller and showed her the two six-pack photographic lineups. Although Barajas appeared to be frightened and reluctant to view the photographs, she identified Montecino's photograph. She told the detective that she knew him from the block as "Lazy," and that she knew he had a 213 tattoo on the back of his head. Barajas added that Montecino was not present the day of the robbery and if it had been Lazy, she probably would not have called because he knew who she was and where she lived. Barajas also said she did not want to testify because the guys from the block knew who she was and where she lived and she was afraid they might retaliate against her.

5

Shortly after Barajas spoke to Detective Antista she encountered Montecino's ex-girlfriend Eileen at the local swap meet. When Eileen asked why she had been speaking to the police, Barajas replied that it was "just for a line-up of a robbery that happened on Spruce." Barajas told Eileen that Montecino was not there. Barajas then telephoned Detective Antista and told him about the conversation with Eileen. Not long thereafter Barajas and Detective Antista exchanged text messages. Barajas wrote: "I can't go Tuesday, I can't do this, I'm scared"; and "I live on this block. I am scared. I can't. Sorry." Detective Antista texted back that she had to appear in court because of the subpoena, and he asked the name of the girl who had contacted her. Barajas replied, "I can't say nothing, sorry, I just can't."

At trial, Barajas testified she could not remember the robbers' descriptions, denied that she had ever seen the robbers before, and claimed that she could not identify them. Barajas denied knowing Montecino and claimed he did not live in the neighborhood, that she had merely seen him passing by and had heard "them" calling him Lazy down the block. Barajas initially denied knowing whether Montecino was a gang member or ever having tattoos, but then admitted she had seen the 213 tattoo on the back of his head and believed he was a member of the 213 gang. Barajas testified it was not safe to report criminal activities to the police in that neighborhood or to testify against 213 gang members.

### *Gang evidence*

Montebello Gang Detective Omar Rodriguez testified as the prosecution's expert in gang culture, and in particular the 213 gang. Detective Rodriguez explained that gangs ensured their existence and ability to operate freely in a community by instilling fear in the area residents, often by committing acts of violence to scare them and make them reluctant to call the police or become involved in the prosecution of crimes. Law enforcement officers found it difficult to persuade witnesses of gang crimes to come to court and testify as to what had happened. Often when witnesses did report gang crimes they would refuse to provide contact information and ask to remain anonymous.

Detective Rodriguez testified that the 213 gang was a local gang of 60 to 70 members with cliques. The culture in which the 213 gang operated was typical of gangs that used violence to control a community with fear, which they considered a form of respect. Gangs could not exist without such respect, as otherwise rival gang members and even fellow gang members might attack them or otherwise take advantage of what was perceived as weakness. Gangs and their members gained respect by committing acts of violence -- the more violent the act, the greater the respect. Such respect enabled gangs to commit crimes with impunity and maintain control over their sources of income, typically narcotics sales. The primary activities of the 213 gang were theft, burglary, auto theft, vandalism, assaults, assault with a deadly weapon, robbery, possession of narcotics, sales of narcotics, and murder. Some witnesses who had testified against 213 gang members had been subjected to violence. Detective Rodriguez presented certified records of the conviction of two 213 gang members, one for felony marijuana sales in 2010, and the other for being a felon in possession of a firearm, also in 2010.

The area around Superior Market was within 213 territory and the area surrounding Spruce and Los Angeles Streets was the primary hub of the territory. The 213 gang, like other gangs, often marked its territory with graffiti, which usually reappeared after area merchants or the City painted it over. Detective Rodriguez showed several photographs of graffiti in 213 gang territory, including one displaying the name "Chuckie," which Detective Rodriguez recognized as the moniker of a gang member who lived on South Bluff Road in a residence where the detective had been on calls and had seen 213 gang members congregating (though not Montecino). There was a great deal of gang graffiti in the alley outside that residence.

In Detective Rodriguez's opinion Montecino was a 213 gang member. Explaining the basis of his opinions, Detective Rodriguez testified that he knew Montecino, having arrested him more than once and having had many conversations with him. Montecino admitted to Detective Rodriguez that he was a gang member, and his tattoos and open association with other gang members corroborated the admission. Detective Rodriguez explained Montecino's tattoos in photographs shown to the jury: "V 213" on his right

forearm, with the V representing *varrio*, Spanish for neighborhood; "Spruce" across the chest; "2X3" on his right hand, representing 213; "SLS" on his left forearm, meaning Spruce Street Locos, a clique within the 213 gang; and on one arm, a marijuana leaf with a 213 on the body. Detective Rodriguez also explained several photographs depicting Montecino displaying hand signs used by the 213 gang, 213 gang related images taken from Montecino's cell phone, and Montecino with other 213 gang members, as well as a photograph showing Montecino's injured eye. Detective Rodriguez met Perez for the first time on July 28, 2013. Perez did not appear in any Montebello database as a 213 gang member, and Detective Rodriguez found no other document indicating his gang membership.

In Detective Rodriguez's opinion Perez was, at a minimum, an associate of the 213 gang. His opinion was based on evidence that Perez committed a crime in 213 gang territory with a documented 213 gang member and stated "213" during the crime, thus identifying the name of the gang to which he belonged, or "claiming the gang." To claim the gang was one way to intimidate a non-gang affiliated citizen who lived in the area. Detective Rodriguez explained that if a person falsely claimed membership in the 213 gang he would be assaulted by the gang's members.

In response to a hypothetical question based upon the evidence presented, Detective Rodriguez gave his opinion that the crime was committed for the benefit of or in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members.

### *Second robbery, count 2*

Calderon lived on South Bluff Road, across the street from the house in which Detective Rodriguez had seen 213 gang members congregating. Calderon testified that he was afraid of the people there, afraid to look at the house, and afraid to come out of his own home. Calderon knew that the area was controlled by a gang, and had seen much 213 graffiti in the neighborhood. He believed that gang members watched him from that house. Calderon was afraid for his safety and that of his family due to his giving testimony, and had spoken to the district attorney's office about relocation.

8

On July 29, 2013, at about 11:00 p.m., Calderon was outside his apartment building unloading some things from his car when he saw a group of young people watching him from the front of the house across the street. Thinking they were gang members, Calderon felt uncomfortable. After the car was unloaded, Calderon parked it on Second Street and began walking home through a nearby alley. A truck passed him slowly and the occupants of the truck stared at him. As soon as the truck passed, a young man who had apparently been in the truck, appeared. The young man had walked beside Calderon for about 15 feet, when he took out a gun and pressed it against Calderon's chest. The man took Calderon's cell phone from his hand and told him in Spanish to give up all his money. Calderon gave the man his wallet and the keys to his truck. After he found no money in the wallet, the robber threw it and the keys down, said something about sparing Calderon, and walked back to the house where gang members were known to congregate. Calderon walked home where his son called the police.

Calderon testified that the young man was between 19 and 22 years old, wore a black baseball cap and a black basketball jersey, had a problem with one eye which appeared to be lower than the other, and was "more or less" three inches shorter than Calderon, who was five feet eleven inches tall.[3] Calderon told a detective later that the robber's eye was "crooked." Calderon identified Montecino in court as the robber and stated that he was 100 percent positive, although at the time of his field identification, he was 80 percent certain of Montecino.

Officer Fernando Valle testified that he immediately responded to the robbery call, but as he was arriving at Calderon's apartment complex, there was a radio call regarding shots fired about one block away, on Second Street. Officer Valle drove around that area and noticed a white Camry moving slowly behind him. At Officer Valle's request, Officer Newton stopped the white Camry, along with a black Camry following behind. Officer Newton ordered the occupants out of the car, including Montecino, who was wearing a black baseball cap. Another occupant, Guadalupe Collins (Collins), said she

---

[3]     Detective Antista estimated Montecino to be about five feet ten inches tall.

was there because her granddaughter had called hysterically saying there had been a shooting.

The group was moved to a safe location and detained while Officer Valle and other officers searched the house. After four people from the house were removed and detained in the alley, Officer Valle went back to speak to Calderon. Calderon was afraid and insisted on having his home lights off when he spoke to the officer so no one would see he was speaking to the police. When Calderon described the location of the robbery and said the robber was wearing a black cap and black basketball jersey, Officer Valle took him to the place where the two groups had been detained in order to conduct a field show-up. Calderon did not mention the robber's eye. Montecino was not in the first group shown to Calderon, who was seated in the back of a patrol car, about 20 to 30 yards away. Calderon identified a man who was wearing a black basketball jersey with a black shirt under it, but no baseball cap, later identified as Jose Uribe (Uribe).

Officer Valle then took Calderon to see Montecino, who was about five inches taller than Uribe and wore black pants, a light gray shirt, and a black baseball cap.[4] When the police car's spotlight was shone on Montecino, who was alone, Calderon immediately identified him as the robber. When Officer Valle asked about the first man he had selected, Calderon was adamant it was Montecino. The officer noticed that Calderon had been slower in his selection of Uribe.

Collins testified that on July 29, she received a frantic call from one of her granddaughters, asking to be picked up and giving the address of the house where Detective Rodriguez and Calderon had seen 213 gang members. Collins knew that the usual way to the house was through the back alley, so she drove there in her white Toyota Camry with her husband following in his black Camry. Collins parked and waited until her granddaughter and Montecino came out of the alley. As soon as Montecino got into the car the police arrived and detained them. Collins claimed that Montecino spoke only

---

[4]     Detective Antista guessed that Uribe was about five feet three or four inches tall.

10

English, explaining that she had known him all of his life and had never known him to speak Spanish.

**Defense evidence**

Louie Landeros testified that he grew up in same neighborhood as his friend, Montecino's father. Landeros had known Montecino all his life and although Landeros could speak Spanish, he had never had a conversation in Spanish with Montecino. Landeros never heard Montecino say any words in Spanish. Landeros admitted that he saw Montecino only periodically, did not know whether he was a gang member, had not seen the 213 tattoo on back of his head, or any of his other tattoos. Although the 213 tattoo on his hand was visible in court, Landeros denied having seen it before. Landeros also denied being a gang member, but said he had nothing against gang members.

Corporal Stephen Sharpe testified that when he interviewed Medina shortly after he was robbed, there were three people standing at a distance. Medina looked very frightened and was reluctant to provide any information. Medina said he knew the suspect from the area and that one of them said 213 to him, but he was uncertain which one. Medina could not give a good description of the robbers because he was scared, but said that one suspect was younger than the other, that one was wearing a black shirt and the other was wearing a checkered shirt.

Detective Antista and Officer Scott Howard were also called to testify in Perez's defense. Detective Antista was questioned about discrepancies in his testimony and police reports regarding the chase of the fleeing suspects after the Medina robbery, including their routes, descriptions, and clothing. Officer Howard testified that he monitored Perez during medical treatment immediately after he was detained, and then took Perez from the hospital to the police station late that night for booking. Officer Howard did not know what Perez was wearing when he was transported, and did not know when Perez's personal clothing was taken from him.

DISCUSSION

## I. Jury instruction

Perez contends that the judgment must be reversed because the trial court erroneously failed to give, sua sponte, a jury instruction such as CALCRIM No. 358 to inform the jury that oral statements made out of court should be viewed with caution.[5] "It is well established that the trial court must instruct the jury on its own motion that evidence of a defendant's unrecorded, out-of-court oral admissions should be viewed with caution. [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 679.) As there was evidence here that Perez said "213" to Medina during the robbery, the trial court erred in failing to give the instruction. However, we agree with respondent that the error was harmless.

"The standard of review for erroneous failure to give the cautionary instruction is 'the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given. [Citations.]'" (*People v. Dickey* (2005) 35 Cal.4th 884, 905.) "'Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]' [Citation.] [¶] Where there was no such conflict in the evidence, but simply a denial by the defendant that he made the statements attributed to him, we have found failure to give the cautionary instruction harmless. [Citation.]" (*Id.* at pp. 905-906.) "Further, when the trial court otherwise has thoroughly instructed the

---

**5** CALCRIM No. 358 reads: "You have heard evidence that the defendant made [an] oral or written statement[s] (before the trial/while the court was not in session). You must decide whether the defendant made any (such/of these) statement[s], in whole or in part. If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement[s]. [¶] [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]" See also CALJIC No. 2.71.

jury on assessing the credibility of witnesses, we have concluded the jury was adequately warned to view their testimony with caution. [Citation.]" (*People v. McKinnon, supra*, 52 Cal.4th at p. 680; see also *People v. Dickey, supra*, at pp. 906-907.)

All of the above listed factors are present here. Perez's defense was that he was misidentified as a perpetrator, in essence, a denial that he said "213" or anything else to Medina. He focused on the inconsistencies in the identification of the clothing he wore and police confusion during the chase. Defense counsel argued that Perez was not one of the robbers, was not there, and that the police arrested the wrong man. In addition, there was no conflict about the exact words used, their meaning, or whether the words were repeated accurately. And finally, the trial court gave thorough jury instructions, by reading CALCRIM Nos. 226, 302, 315, and 316, regarding the evaluation of witness testimony in general, conflicting evidence, eyewitness identification, and credibility.

Perez contends that Barajas's testimony created a conflict, because she did not hear the words despite being within earshot and hearing other statements attributed to the robbers. He is mistaken. Rather, the evidence was that Barajas was not within earshot and did not hear other statements made by the robbers. She testified she heard them talking, but did not hear anyone say "213" or any other statements well enough to understand them. She simply guessed that the robbers were demanding money. When asked whether she could hear them talking, Barajas replied: "No, they were just like -- I guess they were talking, but then were saying like, I guess, what he had in his pockets. That's it." Barajas merely told the 911 operator that she saw the robbers checking the victim's pockets.

The only conflict raised by the evidence concerned which of the two robbers made the statement. Immediately after the robbery, Medina told Corporal Sharpe that he was not sure which robber had said 213. At trial, however, Medina testified that Perez made the statement. Thus, there was no "conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]' [Citation.]" (*People v. Dickey, supra*, 35 Cal.4th at pp. 905-906.)

13

Perez argues that if the instruction had been given, the jury would surely not have found the gang enhancement to be true, because there was no other evidence that he was a gang member. Since the prosecution was not required to prove that Perez was a gang member, we are not persuaded by this argument. (See *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 [non-gang member codefendant acted in concert with known gang members].) The gang enhancement applies where any defendant committed the crime in association with a known gang member, with the specific intent to promote, further, or assist criminal conduct by the gang member. (§ 186.22, subd. (b)(1); see *People v. Albillar* (2010) 51 Cal.4th 47, 61-62, 67-68.) Thus, the jury could reasonably find that the crime was gang related if the evidence showed that Perez knew that his accomplice was a gang member, even if it did not prove Perez's gang affiliation. Detective Rodriguez testified that claiming the gang was intended not only to help the gang control the neighborhood through intimidation, but also to identify the speaker as a gang member. It follows that whether Perez or his accomplice "claimed the gang," the utterance provided substantial evidence that Perez knew that his accomplice was a gang member.

There was other evidence which supported the finding that Perez intended to assist a gang related crime. The crime was committed in the hub of the 213 gang's territory. Detective Rodriguez testified that it was unlikely that a robbery committed in that spot would not be gang related. Further, Officer Marquez identified the accomplice as Montecino, an admitted gang member whose many tattoos made his gang affiliation obvious. Although Montecino wore a hat which may have covered the 213 tattooed on the back of his head, it is unlikely that his several arm tattoos were covered in late July. Furthermore, the 213 tattoo on Montecino's hand remained visible, as defense witness Landeros testified it could be seen from the witness stand.

In sum, if the instruction had been given and the jury decided that it was not Perez who uttered 213, it is not reasonably probable that the result would have been different. Thus the error was harmless.

14

## II.  Stay of gang enhancement

Perez contends that the trial court erred in staying rather than striking the gang enhancement, and asks that the judgment be modified.

The jury's true finding of the section 186.22, subdivision (b)(1)(C) enhancement called for an additional sentence of 10 years.  However, the plain language of subdivision (g) of that section allows the court, in its discretion, to *strike* the additional punishment in the interests of justice, so long as the court states its reasons on the record.[6]  The provision does not permit staying the punishment.  As Perez notes, "[t]he difference between 'striking' and 'staying' is not a mere linguistic difference."  (*People v. Calhoun* (1983) 141 Cal.App.3d 117, 126.)  Respondent agrees that there is no authority for staying the enhanced punishment, but does not agree that the error should be corrected here, and instead requests a remand for resentencing by the trial court.

An erroneous stay results in an unauthorized sentence.  (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.)  Reversal and remand for resentencing is required if the sentencing error may affect the trial court's exercise of discretion.  (*People v. Edwards* (2011) 195 Cal.App.4th 1051, 1060.)  However, where the trial court exercised its discretion and stated its reasons on the record, the judgment may be modified on appeal to reflect the trial court's clear intent. (See *People v. Jefferson* (2007) 154 Cal.App.4th 1381, 1388; *People v. Murray* (1994) 23 Cal.App.4th 1783, 1792-1793; § 1260.)

Here, it is apparent from the record that the trial court's sentencing decision to stay the gang enhancement was based on subdivision (g) of section 186.22, and that the court merely misspoke.  The judge stated:  "The court does have the discretion.  I am going to exercise my discretion to stay the 10 years because I do think that Mr. Perez is at a turning point."  The trial court considered the letters and testimony of Perez's relatives

---

[6]     Section 186.22, subdivision (g), reads:  "Notwithstanding any other law, the court may strike the additional punishment for the enhancements provided in this section or refuse to impose the minimum jail sentence for misdemeanors in an unusual case where the interests of justice would best be served, if the court specifies on the record and enters into the minutes the circumstances indicating that the interests of justice would best be served by that disposition."

15

and others, as well as evidence of his academic achievements, employment, and participation in the Explorers program, and noted the absence of a prior criminal record or prior gang contacts. The court recommended fire camp, and expressed the belief that a shorter prison term and the support of his family was more likely to set his life "on the right path."

Because the trial court expressed a clear intent not to add the enhanced punishment to Perez's sentence and stated its reasons on the record, we will modify the judgment to strike the punishment in lieu of remanding for further proceedings.

## III. Effective assistance of counsel

Montecino contends that the judgment must be reversed due to the ineffective assistance of his trial counsel. In particular, Montecino argues that counsel rendered ineffective assistance by failing to seek severance of the counts or to object to the use of gang evidence to support count 2, without any sound tactical reason for the omissions.

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-674; see also Cal. Const., art. I, § 15.) "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) "Moreover, '"a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." [Citation.]' [Citation.]" (*Ibid.*; see also *Strickland v. Washington, supra*, at pp. 688, 694.)

We first reject Montecino's claim that counsel rendered ineffective assistance by failing to object to the use of gang evidence to support count 2. As noted by respondent, Montecino has not pointed to specific evidence to which he believes counsel should have

16

objected. Thus, Montecino's complaint is apparently that counsel should have objected to the use of any or all gang evidence with regard to count 2. However, the record shows that counsel did, in fact object to the use of gang evidence in count 2. The issue arose during the trial court's discussion of jury instructions. The court ruled that some of the gang evidence was admissible in count 2 on the issue of Montecino's identity and instructed the jury with CALCRIM No. 1403, limiting the jury's consideration of evidence of gang activity to the question of the suspect's identity in count 2. Montecino does not contend that the trial court's ruling was an abuse of discretion or that the instruction was inadequate to dispel any prejudice.

We also reject Montecino's contention that counsel rendered ineffective assistance by failing to move for separate trials on the two counts; and we do so without the necessity of considering whether counsel's performance was deficient or what his tactical reasons might have been, as we conclude that Montecino has not met his burden to show prejudice. (See *People v. Rodrigues, supra*, 8 Cal.4th at p. 1126.) To establish prejudice due to the failure of counsel to move to sever counts, a defendant must demonstrate that the trial court would have abused its discretion in denying such a motion. (*People v. Maury* (2003) 30 Cal.4th 342, 392.) The trial court has broader discretion in ruling on a motion to sever than in ruling on the admissibility of evidence, and that discretion will not be disturbed unless the ruling exceeds the bounds of reason. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220-1221.) Section 954 permits the joinder of "two or more different offenses connected together in their commission, or . . . two or more different offenses of the same class of crimes or offenses, under separate counts." Section 954 represents a strong legislative preference for such joinder, as a unitary trial avoids the expense of two courtrooms, additional courtroom personnel, and two juries; and "'the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process.' [Citations.]" (*People v. Soper* (2009) 45 Cal.4th 759, 772.)

As the two counts were charged under section 211, they belonged to the same class of crimes; thus, the statutory requirements for joinder were satisfied and Montecino

17

must show that granting a motion to sever would have been required due to potential prejudice from jointly tried charges.  (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1315 (*Bradford*).)  Respondent suggests that we consider only the preliminary hearing evidence in making this determination, as we ordinarily review the denial of a motion to sever properly joined charges by considering the record before the trial court when it made its ruling.  (*People v. Soper, supra*, 45 Cal.4th at p. 772.)  However there is no record of such time.  Thus, to determine whether counsel was ineffective in failing to bring a motion to sever we consider the trial evidence.  (Cf. *People v. Maury, supra*, 30 Cal.4th at pp. 392-393.)

“‘“‘The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial.” [Citation.]  Refusal to sever may be an abuse of discretion where:  (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a “weak” case has been joined with a “strong” case, or with another “weak” case, so that the “spillover” effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]’ [Citations.]” (*Bradford, supra*, 15 Cal.4th at p. 1315.)

The parties have approached this issue as though there was no cross-admissibility of evidence, arguing only the other factors at length.  However, as we observed in our discussion of Montecino’s first ground for claiming ineffective assistance, the trial court determined after hearing all the evidence that some of the gang evidence was cross-admissible on the issue of Montecino’s identity.  The other criteria enumerated in *Bradford* are not equally significant; if the “‘joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others . . . any inference of prejudice is dispelled.’ [Citations.]” (*Bradford, supra*, 15 Cal.4th at pp. 1315-1316.)  Indeed, “[i]f the evidence underlying the joined charges would have been cross-

18

admissible at hypothetical separate trials, 'that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' [Citations.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 38.)

The trial court found the gang evidence to be relevant to the issue of identity and thus cross-admissible, and there is no reason to believe that its ruling would have been different in a pretrial motion to sever counts. Evidence Code section 1101, subdivision (b) permits the admission of evidence of another crime or conduct when relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or other fact other than the defendant's criminal disposition. "Evidence of the defendant's gang affiliation -- including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like -- can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) In *Hernandez*, the California Supreme Court held that a trial court did not abuse its discretion in refusing to bifurcate trial of the charged offense with the gang enhancement, and noted that in cases where gang evidence is relevant to two separately charged counts, the preference for a joint trial is even greater due to the inefficiency in having separate trials with separate juries in the latter circumstance. (*Id*. at pp. 1050-1051.) And it is not necessary for all the gang evidence to be cross-admissible to justify the denial of a motion to sever. (*Id*. at p. 1049.)

Here, the primary issue in count 2 was the identity of the perpetrator. Although Calderon was between 80 and 100 percent certain of his identification of Montecino, his conflicting field identifications, his statements to the police, and his testimony could have created some doubt.[7] The gang evidence was useful in resolving that issue. Detective

_____

[7]     In his argument on appeal, Montecino exaggerates some of the conflicts. For example, he argues that Uribe's five feet three inches "precisely matched" the description Calderon gave to the police. Calderon testified that he told the police that the robber was shorter than he, but did not know how much shorter. To demonstrate, when pressed in cross-examination, Calderon placed his hand in a position which defense counsel described as "around your nose and your moustache"; and without waiting for court

Rodriguez testified that robbery was one of the 213 gang's primary criminal activities, and intimidating members of the community was a method gangs used to operate freely within their neighborhoods. Officer Marquez was certain of his identification of Montecino as the second suspect in the Medina robbery, which was clearly gang related, given that the robbers named the 213 gang. The robbery of Calderon took place in 213 gang territory, near a house where gang members were known to congregate. Calderon was walking alone in the nearby alley, when a truck, apparently occupied by gang members including the person who robbed Calderon, passed. The robber walked back to the house where the gang members congregated following the commission of the crime. Montecino, a 213 gang member, came from the vicinity of that house when Collins arrived to pick up her granddaughter. The second robbery was committed just two days after the first, and the similar circumstances suggested a modus operandi, as each of the victims was a resident of the gang's neighborhood, each victim was walking alone in gang territory, and both robberies yielded little, thus appearing to have been committed primarily to intimidate a resident.

In sum, much of the gang evidence admitted to prove the gang allegation attached to count 1 would have been admissible in a separate trial of count 2 to show that Montecino was not coincidentally in the neighborhood, that he was associating with fellow gang members with a motive to intimidate area residents, and had committed a similarly motivated crime two days earlier. As such evidence bolstered Calderon's identification of Montecino, we agree with the trial court that it was relevant to the issue of the identity of the perpetrator in count 2, and conclude that the trial court would not have abused its discretion in denying a motion to grant separate trials on the two counts. Montecino has thus failed to meet his burden to demonstrate he was prejudiced, and his claim of ineffective assistance of counsel must be rejected. (See *Strickland v.*

confirmation of the gesture, counsel asked whether the robber was "maybe about three inches shorter than you?" Calderon replied, "More or less." Uribe was eight inches shorter than Calderon, while Montecino was one inch shorter. There was thus no precise match to Uribe. Indeed, Montecino's one-inch difference is much closer to "more or less" three inches than Uribe's seven- or eight-inch difference.

*Washington, supra*, 466 U.S. at pp. 688, 694; *People v. Rodrigues, supra*, 8 Cal.4th at p. 1126.)

## DISPOSITION

The judgment against Montecino is affirmed. The judgment against Perez is modified to strike, rather than stay, the 10-year enhancement as to count 1 pursuant to section 186.22, subdivision (b)(1)(C); and as so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT

21